UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

SPORTS UNIVERSITIES LLC,

Plaintiff,

- against -

ROBERTA MARCENARO LYON,

Defendant.

Civil Action No.: 1:24-cv-05354

COMPLAINT

Plaintiff SPORTS UNIVERSITIES LLC, by and through its undersigned attorney, hereby alleges as follows:

**PARTIES**

1. Plaintiff Sports Universities LLC ("SU") is a Delaware limited liability company with an address at 28 Chelsea Avenue, Marmora, NJ 08223.

2. Upon information and belief, Defendant Roberta Marcenaro Lyon ("Lyon") is an individual with an address at 1300 Pennsylvania Avenue, NW, Suite 700, Washington, DC 20004.

**JURISDICTION**

3. This Court has original jurisdiction of this action under 28 U.S.C. §1332..

**VENUE**

4. Venue is proper under 28 U.S.C. §1391(b)(2) as it is the district in which a substantial part of the events or omissions giving rise to the claim occurred.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Fraudulent Inducement)**

5. At all times hereinafter mentioned, SU is a limited liability company that is in the business of creating a pathway for young aspiring athletes to continue their education while pursuing their dream of becoming professional soccer players.

6. At all times hereinafter mentioned, Lyon is an individual who, according to her LinkedIn page, alleges that in her position as the Founder and Chief Executive Officer for an entity called IMark Holdings ("IMark"), she works with clients in the United States and Europe to "build companies and forge strategic alliances".

7. Upon information and belief, in or around June 2023, third party Roberto Piediscalzi ("Piediscalzi") entered into an Investment Services Agreement with SU (the "Piediscalzi/SU Agreement") whereby Piediscalzi, in exchange for a "success fee" (the "Piediscalzi/SU Success Fee"), was to provide services to SU that included: (i) introducing SU to potential investors; (ii) assisting SU in preparing and choosing possible investors; and (iii) coordinating discussions between SU and potential investors (the "Piediscalzi/SU Services").

8. The Piediscalzi/SU Agreement was executed on behalf of SU by the principal for SU, Matthew Driver ("Driver"), and Piediscalzi.

9. Upon information and belief, in or around June 2023, Piediscalzi entered into an agreement with Lyon and/or IMark whereby Lyon would perform the Piediscalzi/SU Services for Piediscalzi in exchange for Piediscalzi providing a portion of the Piediscalzi/SU Success Fee to Lyon (the "Piediscalzi/IMark/Lyon SU Success Fee Agreement").

10. Upon information and belief, beginning in or about September 2023, Lyon, pursuant to the Piediscalzi/IMark/Lyon SU Success Fee Agreement, communicated with James Largotta ("Largotta"), the principal for third party Sentegrity LLC ("Sentegrity"), a New York limited liability company that provides global financial, technical and strategic advisory services to its clients, whereby Lyon stated to Largotta that: (i) SU was seeking investors and would be a potential profit-making venture that could

benefit Sentegrity; and (ii) Lyon would introduce Sentegrity to SU in exchange for a referral fee (the "Lyon Initial SU Representations to Sentegrity").

11. Also in or around September 2023, Lyon: (i) falsely stated to Driver that a) Sentegrity had a "deadline" as it had "investors lined up who needed to invest by the close of 2023 or else the deal would collapse and the investors would invest their money elsewhere", b) Sentegrity was ready to "put its own money" in a deal with SU in the amount of Thirty Million Dollars ($30,000,000.00); c) in order for Sentegrity to remain interested in working with SU, SU immediately had to purchase back twenty percent (20%) of SU's equity that belonged to a single shareholder; and d) all communications between Sentegrity and SU had to go through Lyon pursuant to Largotta's instructions (the "Lyon Fraudulent Representations to SU"); and (ii) upon information and belief falsely stated to Largotta that a) Largotta could not speak with Driver regarding any potential business arrangement between Sentegrity and SU; and b) all communications between Sentegrity and SU had to go through Lyon pursuant to Driver's instructions (the "Lyon Fraudulent Representations to Sentegrity").

12. None of the Lyon Fraudulent Representations to SU were true.

13. In or around September 2023, in reliance upon the Lyon Fraudulent Representations to SU, SU was forced to take out a quick loan at a higher rate than SU would ever have taken out in the normal course of business in order to purchase back the twenty percent (20%) of SU's equity that belonged to a single shareholder, which resulted in leaving SU in financial distress as SU: (i) could no longer financially meet its staffing requirements that resulted in a loss of players, business income and reputation; and (ii) was left with a number of outstanding debts, including for accommodations, food services and equipment.

14. At no time did Lyon state to Driver that Lyon made the Lyon Fraudulent Representations to Sentegrity (the "Lyon Fraudulent Omissions to SU").

15. On October 18, 2023, Lyon sent an email to Driver whereby Lyon alleged that Lyon, and not IMark, had an agreement with Sentegrity whereby Lyon would own four percent (4%) of SU (the "10/18/23 Lyon SU Email").

16. Between October 18, 2023 and in or around March 2024, SU believed that Lyon was entitled to four percent (4%) of SU.

17. Had SU had knowledge of: (i) the fact that the Lyon Fraudulent Representations to SU were false; and (ii) Lyon Fraudulent Omissions to SU, including the existence of the Lyon Fraudulent Representations to Sentegrity, SU: a) would never have taken out in the normal course of business the quick loan in order to purchase back the twenty percent (20%) of SU's equity that belonged to a single shareholder, which resulted in leaving SU in financial distress as SU i) could no longer financially meet its staffing requirements that resulted in a loss of players, business income and reputation and ii) was left with a number of outstanding debts, including for accommodations, food services and equipment; and b) would never have agreed to Lyon being entitled to any equity in SU, let alone four percent (4%) of SU.

18. Further, as a result of both the Lyon Fraudulent Representations to SU and the Lyon Fraudulent Representations to Sentegrity, unnecessary friction and distrust developed between Largotta and Driver that contributed to putting any deal between Sentegrity and SU in jeopardy.

19. In or around March 2024, Driver became aware of: (i) the fact that the Lyon Fraudulent Representations to SU were false; and (ii) the Lyon Fraudulent Omissions to SU, including the existence of the Lyon Fraudulent Representations to Sentegrity.

20. When Driver confronted Lyon with SU's becoming aware of: (i) the fact that the Lyon Fraudulent Representations to SU were false; and (ii) the Lyon Fraudulent Omissions to SU, including the existence of the Lyon Fraudulent Representations to Sentegrity, Lyon stated to Driver that "I told you what I needed to tell you to get the deal done."

21. On March 20, 2024, as a result of Driver having become aware of: (i) the fact that the Lyon Fraudulent Representations to SU were false; and (ii) the Lyon Fraudulent Omissions to SU, including the existence of the Lyon Fraudulent Representations to Sentegrity, SU lawfully terminated the Piediscalzi/SU Agreement.

22. Lyon knew that: (i) the Lyon Fraudulent Representations to SU; and (ii) the Lyon Fraudulent Omissions to SU, including the existence of the Lyon Fraudulent Representations to Sentegrity were false or were made with a reckless indifference to the truth.

23. Lyon intended to induce SU into believing that Lyon was entitled to four percent (4%) of SU by making (i) the Lyon Fraudulent Representations to SU; and (ii) the Lyon Fraudulent Omissions to SU, including the existence of the Lyon Fraudulent Representations to Sentegrity.

24. By making: (i) the Lyon Fraudulent Representations to SU; and (ii) the Lyon Fraudulent Omissions to SU, including the existence of the Lyon Fraudulent Representations to Sentegrity, Lyon engaged in willful and outrageous conduct flowing from an evil motive to defraud SU.

25. As a result of SU's justifiable reliance upon (i) the Lyon Fraudulent Representations to SU; and (ii) the Lyon Fraudulent Omissions to SU, including the existence of the Lyon Fraudulent Representations to Sentegrity, Sentegrity has suffered and will continue to suffer damages in an amount of no less than $457,627.03 plus punitive damages, pre-judgment and post-judgment interest, costs and expenses incurred.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Declaratory Judgment)**

26. SU repeats and realleges each and every allegation contained above and below as if fully set forth at length herein.

27. Had SU had knowledge of: (i) the fact that the Lyon Fraudulent Representations to SU were false; and (ii) Lyon Fraudulent Omissions to SU, including the existence of the Lyon Fraudulent

Representations to Sentegrity, SU would never have agreed to Lyon being entitled to any equity in SU, let alone four percent (4%) of SU.

28. Pursuant to the Declaratory Judgment Act codified in 28 U.S.C. §2201, in a case of actual controversy within this Court's jurisdiction, this Court, upon the filing of this Complaint, may declare the rights and other legal relations of any interested party seeking such declaration.

29. Thus, SU is entitled to a declaratory judgment that Lyon is not entitled to any referral fee and/or equity in SU as a result of any theory of express or implied contract or unjust enrichment, plus relief in the form of costs and expenses incurred.

## PRAYER FOR RELIEF

**WHEREFORE**, SU respectfully prays for relief as follows:

A. That the Court enter judgment in the First Cause of Action in an amount of no less than $$457,627.03 plus punitive damages, pre-judgment and post-judgment interest, costs and expenses incurred; and

B. That the Court enter judgment in the Second Cause of Action in the form of a declaratory judgment that Lyon is not entitled to any referral fee and/or equity in SU as a result of any theory of express or implied contract or unjust enrichment, plus relief in the form of costs and expenses incurred; and

C. That the Court award SU such other and further relief as the Court deems just, proper and equitable.

Dated: April 19, 2024
New York, New York

_____
Jason R. Mischel, Esq.
201 E. 19th St., #5L
New York, New York 10003
Tel. (646) 807-9220
Email: jrm@jrmlegalresearch.com

*Attorney for Plaintiff*